Phillip Suetter v. Commissioner.
Suetter v. Commissioner
Docket No. 2213.
United States Tax Court
1946 Tax Ct. Memo LEXIS 56; 5 T.C.M. (CCH) 872; T.C.M. (RIA) 46247; October 16, 1946
*56 Taxable net income for 1939 determined from the evidence. Delinquency penalty is imposed, but fraud penalty is disallowed. Robert T. Jacob, Esq., 917 Public Service Bldg., Portland, Ore., and S. J. Bischoff, Esq., for the petitioner. T. M. Mather, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion This case arises out of respondent's determination of the following income tax deficiencies and penalties for the years indicated: Fraud
Delinquency
Year
Deficiency
Penalty
Penalty
1937
$ 866.88
$ 433.44
$ 216.72
1939
9,626.30
4,813.15
2,406.58
1940
597.27
298.64
149.32
The issues are whether petitioner realized net income of $14,126.16 in 1937, $52,300.95 in 1939, and $10,291.40 in 1940, and whether respondent properly imposed the fraud and delinquency penalties for each of those years. Findings of Fact Petitioner is an individual residing at Portland, Oregon. He filed no income tax returns for any of the taxable years in issue. At the time of the hearing he was 73 years of age. Prior to 1933, petitioner was engaged in the business of selling fruit and vegetables and of buying and selling *57 horses, mules, and cattle. In 1933, he went through bankruptcy proceedings, after which he was without funds of his own. In 1934, petitioner, with the financial assistance of one Montag, acquired title to certain mining claims in Josephine County, Oregon, and began development of the properties. He obtained $10,000 from Montag, which he used to pay for the claims and in development work, and gave Montag a mortgage on the property as security. At no time from 1934 through 1936 were the mines producing. Montag later invested additional sums in the mining operations. In the latter part of 1936, petitioner was in need of more capital to buy mining machinery and to further the development of the property. Upon contacting the Link Belt Corporation, manufacturers of mining machinery and equipment, petitioner was advised by one of the officers of the company that for the purpose of raising capital he should establish a trust with certificates of beneficial interest. The corporate officer referred petitioner to an attorney in Chicago to draw up the necessary papers for him. Accordingly, on January 2, 1937, petitioner executed an instrument entitled "Suetter Placer Mines Trust Agreement", *58 in which he declared himself trustee of the mining claims he then had in Josephine County, Oregon. The instrument provided that there were to be 800 units or certificates of beneficial interest; that 350 of the units should be sold at $1,000 each and the remainder retained by petitioner for himself as an individual beneficiary; that the proceeds from the sale of the 350 units should be used exclusively for the purchase of machinery and conduct of mining operations on the property; that each unit holder should be entitled to 1/800th of the net profits from operations; that the interest of a unit holder should be personal property only; that the certificates could be transferred by the holders, subject to petitioner's prior option to buy them; that before any profits could be distributed to petitioner as an individual beneficiary, all other unit holders must first have received a return of their original investment with six per cent interest; that petitioner as trustee should have the sole right to manage and operate the property, and in the event of his death the unit holders could elect a new trustee and manager to operate the property; and that for his services as manager and operator *59 petitioner should receive a monthly salary of $250 payable out of the income of the trust. The instrument was then recorded in the county clerk's office in Josephine County, Oregon. In November or December of 1936, petitioner was placed in contact with Archbishop Beckman of Dubuque, Iowa, from whom petitioner sought financial assistance. After the execution of the trust instrument, petitioner issued to the Archbishop some 120 to 150 certificates of beneficial interests, in return for $59,000 cash and the Archbishop's negotiable promissory notes totaling a little more than $250,000. Most of the notes were payable to the petitioner, but a few were made payable directly to the purchasers thereof. It was understood that if more notes were negotiated than the value of certificates issued to the Archbishop, petitioner would issue further certificates to him to make up the difference. Petitioner also sold a few certificates for cash to persons other than the Archbishop. Thereafter, from time to time, petitioner negotiated a large number of the Archbishop's notes, exceeding $150,000 in the aggregate. The proceeds of the sales he deposited in various bank accounts, some in his name and *60 some in the name of "Suetter Placer Mines", but all maintained for the benefit of the trust. In 1937, he had two such accounts in banks at Crown Point, Indiana, and one in Chicago. From these he paid for purchases of mining machinery and equipment, and thereafter he transferred the account balances to one or more of several bank accounts maintained on behalf of the trust in Oregon. The moneys deposited in the several bank accounts in Oregon, Indiana, and Illinois from the sales of certificates and negotiation of the Archbishop's notes were expended in mining operations and for mining equipment. Petitioner bought no property with these funds for his own personal account, although for convenience bills of sale for mining equipment were sometimes issued in his name. During 1937, and the early part of 1938, petitioner spent much of his time in the East and away from the site of mining operations. While away he was engaged on business of the trust, purchasing machinery and raising capital. Ordinarily he stayed with the Archbishop or with other friends, and part of the time he stopped at a hotel. Checks were drawn on the trust bank accounts to defray his traveling expenses. After his *61 return to the West, he went to the site of the mining operations and lived and took his meals at the mining camp. During all this time his wife stayed at home in Portland, and occasionally took in a few boarders. In addition she had some money of her own. Instead of confining himself to operations on the original mining claims embodied in the "Suetter Placer Mines Trust Agreement", petitioner began in 1938 to take up other mining claims in Oregon and in California. He used some of the trust funds in acquiring these other claims and in buying machinery for equipping them. The first of these was a mining property located in Del Norte County, California, which petitioner acquired in March 1938, and which was afterwards called St. John Bosco Mines. In October of 1938, and February of 1939, he also obtained contracts to purchase further mining properties in Josephine County, Oregon, known as the "Wheeler", the "Ajax", the "Mars", and the "Hercules" mines. The Archbishop became dissatisfied with petitioner's progress and his mode of operations, and because the funds obtained from him were being used to acquire different mining properties. During 1938, and the early part of 1939, a series *62 of agreements was entered into between petitioner and the Archbishop, relating to the operation of both the Suetter Placer and the St. John Bosco mines and, in view of the use of the moneys obtained from negotiation of the Archbishop's notes, recognizing the Archbishop's beneficial interest. In June 1938, the Archbishop sent his personal representative, Mgr. O'Laughlin, to the St. John Bosco Mine to supervise the operations. Upon the arrival of the representative, petitioner turned over the records to him, and he thereafter kept records of the operations. In 1937, 1938 and 1939, no income was produced from mining operations. The work was still in the development stage. Large sums were expended for construction of mining camps, for heavy trucks, automobiles, etc., in addition to mining machinery. In June of 1939, Archbishop Beckman filed suit against petitioner in the Circuit Court of Josephine County, Oregon, alleging, among other things, that petitioner had obtained funds from him to finance mining operations; that petitioner was mismanaging the property; that petitioner had diverted the funds obtained from him to purposes not authorized, namely, toward the acquisition and development *63 of mining claims other than those for which the funds were intended; and that said other properties were accordingly impressed with a trust for the Archbishop's benefit. Relief sought by the Archbishop included an order requiring petitioner to deposit with the court clerk all funds then in petitioner's possession which he had obtained from the Archbishop, together with notes in his possession which had not been negotiated, an accounting from petitioner, the appointment of a receiver to operate the properties, and both a temporary and permanent injunction against petitioner, restraining him from interfering with further operations of the properties. A temporary injunction was issued against petitioner, but before further court action was taken the suit was compromised by agreement between petitioner and the Archbishop, dated June 17, 1939. Under the terms of the agreement, the Archbishop agreed to pay petitioner $20,000 in $5,000 installments, two of which became due in 1939 and two in 1940. He further agreed to release all claims he might have to any personal property and mining equipment which had been acquired by petitioner prior to October 1, 1936, and to release and convey to *64 petitioner all his interest in the beneficial units of the Suetter Placer Mines. He further agreed to use his best endeavor to induce certain holders of other certificates in the Suetter Placer Mines to surrender their interest therein, in return for which he agreed to give them a 2 1/2 per cent interest in properties he was acquiring by virtue of the compromise agreement. In addition, he agreed to release any claim he might have to the St. John Bosco Mine and personal property located thereon. On petitioner's part, petitioner agreed to release and convey to the Archbishop all his interest in a contract to purchase certain real property in Del Norte County, California, to assign to the Archbishop the contracts to purchase the Wheeler, Ajax, Mars, Hercules and Baer mining properties, and to convey his interest in the mining equipment and machinery used on those properties. In addition, petitioner agreed to surrender all unnegotiated notes in his possession and to furnish the Archbishop with a list of all outstanding notes. He further agreed to assign certain outstanding contracts for the manufacture of mining equipment. Shortly thereafter petitioner's attorney turned over to the Archbishop's *65 attorney the remaining notes petitioner then had, a list of the outstanding notes, and certain formal assignments called for by the agreement. In August, 1939, the Archbishop caused to be formed a corporation, known as "Hercules Mining Corporation", to operate the properties he took under the compromise agreement. In the deficiency notice respondent explained his determination of the deficiency for 1937 as follows: In the absence of proper records, your taxable net income has been determined as follows: Gross bank deposits
$34,133.40
Less: Withdrawals for business
expense
20,007.24
Net income
$14,126.16
In 1937, petitioner made deposits totaling $6,900 in the First National Bank of Chicago; deposits totaling $11,255 in the First National Bank of Crown Point, Indiana; and deposits totaling $15,977.40 in the Commercial Bank of Crown Point, Indiana. The combined total of these deposits is $34,132.40. All this money constituted proceeds from the sale of trust certificates and the negotiation of notes and was trust capital. None of it belonged to petitioner personally. Most of it was used to purchase mining machinery and equipment, and the balances in the accounts *66 were thereafter transferred to the Oregon bank accounts maintained by petitioner for the trust. Petitioner also made some other large deposits in the Oregon bank accounts in 1937, all of which represented proceeds of the sale of trust units or negotiation of the Archbishop's notes. These sums were likewise expended in the ordinary course of mining development. In the deficiency notice respondent computed petitioner's income for 1939 as follows: (a) unidentified bank deposits
$ 4,125.95
(b) sales
33,500.00
(c) unidentified receipts
14,675.00
Net income
$52,300.95
EXPLANATION OF NET INCOME In the absence of proper records, your taxable net income has been determined as follows: (a) Unidentified bank deposits. (b) Proceeds from sales of equipment considered taxable income as no offsetting costs have been substantiated. (c) Funds received from unidentified sources in amount of $3,925.00 used to pay personal expenses, and property and cash of $10,750.00 received from F. J. Beckman. In 1939, petitioner sold personal property belonging to the trust, consisting of a dredge, or gold washing plant, dragline, light plant, and lathe, for a total consideration *67 of $33,500. The gold washing plant was sold to Edward R. Bacon Company in California on April 4, 1939, for $22,500. That was prior to the injunction suit. In payment petitioner received a cashier's check for $20,000 and a note for $2,500. The check was deposited in the trust bank account in the name of Suetter Placer Mines, Medford Branch, the United States National Bank of Portland, Oregon, on April 11, 1939; and the proceeds were used in the operations. The note was later collected by petitioner's attorney and retained by him for attorney's fees. The original cost of the gold washing plant in 1938 was $34,366.50, exclusive of revamping and installation costs. The dragline was sold to Willows Equipment Company for $9,000. Its original cost in 1937, exclusive of freight, was $19,737.60. The proceeds were used in connection with operations at Suetter Placer Mines. Petitioner often purchased supplies for cash and met payrolls in cash, and accordingly kept large amounts of cash on hand. The light plant and the lathe were sold to Gerlinger Equipment Company for $2,000. The light plant alone had cost $3,219, exclusive of freight, in 1937. Petitioner deposited the $2,000 in the Suetter *68 Placer Mines trust bank account at the same time he deposited the cashier's check for $20,000 received for the sale of the gold washing plant, that is, on April 11, 1939. On April 15, 1939, checks for $500 and $1,625.95 were deposited in the same account. The sum of these three items is $4,125.25 - the amount which the respondent designated "unidentified bank deposits" in the deficiency notice. These moneys did not belong to petitioner but were trust funds and were used in the course of mining operations. Petitioner did not receive in 1939 the sum of $3,925 from unidentified sources. The sum of $10,750 mentioned in the deficiency notice as being received from F. J. Beckman had reference to two items: first, the $10,000 which under the terms of the compromise agreement dated June 17, 1939, the Archbishop undertook to pay petitioner in 1939 and, second, the proceeds from the sale of a Packard automobile. The Packard automobile was purchased by petitioner in Indiana on September 7, 1937, for $1,557.50, $557.50 in cash on delivery, and the balance of $1,000 was paid with a note of the Archbishop dated August 13, 1937. On August 1, 1939, petitioner sold the car to one Hooper for $750. *69 The $10,000 which the Archbishop was obligated to pay petitioner in 1939 was remitted to the attorney who represented petitioner in the injunction suit. This sum was to compensate petitioner for work he had done in connection with the mines. On August 4, 1939, the attorney issued his personal check to petitioner in the amount of $4,500, drawn on the Medford Branch of the United States National Bank. The check was endorsed by petitioner and cashed the same day. On August 11, 1939, petitioner opened an account in that bank in the name of the Oregon Mining Investment Co., Inc., making an initial deposit of $3,000, and $2,000 additional on August 14. The Oregon Mining Investment Co., Inc., was a corporation organized by petitioner in August, 1939, on the advice of his attorney, shortly after settlement of the Archbishop's suit. The reason for its organization was that petitioner had had some trouble with the Archbishop's representative. He held all the shares except two qualifying shares in the names of his attorney's two stenographers. On November 17, 1939, petitioner's attorney issued his second check for $4,500 in payment of the balance of the 1939 remittance from the Archbishop *70 and deposited it to the credit of the Oregon Mining Investment Co., Inc. Roberts' two checks totaled $9,000. The difference of $1,000 was retained by him as attorney's fees in connection with the transaction. In the deficiency notice respondent determined petitioner's income for 1940 as follows: (a) unidentified receipts
$ 291.40
(b) other income
10,000.00
Net income
$10,291.40
EXPLANATION OF NET INCOME (a) Funds received from unidentified sources in amount of $291.40 used to pay personal expenses are held to represent taxable income. (b) This adjustment represents the value of equipment received from F. J. Beckman. Petitioner did not receive in 1940 from unidentified sources the amount of $291.40, or any other amount, which he used for personal expenses. The item of $10,000 referred to in the deficiency notice had reference to property said to have been received from the Archbishop. When petitioner sought to collect from the Archbishop the $10,000 due him in 1940 under the terms of the compromise agreement of June 17, 1939, the Archbishop induced him to agree to accept certain mining equipment consisting of a fuel tank, a caterpillar tractor, an Armstrong *71 drill, an air compressor, and an electric welder. The Archbishop gave petitioner three letters, dated August 29, 1940, addressed to the Archbishop's representative at the mining operations, directing the latter to turn over this equipment to petitioner as well as some other items of personal property which petitioner had acquired prior to 1937. When petitioner took the letters to the Archbishop's agent at the site of the mining operations, they refused to release the property to him. The property had been attached in a suit against the Hercules Mining Corporation, and it was later sold by the corporation to a subsidiary of the Sun Oil Company. Petitioner did not receive any of the property, not even his own personal belongings, nor did he receive any money in lieu thereof. In 1939 or 1940, petitioner and Montag invested some money, approximately $7,500, in the drilling of oil wells in Kansas, but the venture was unsuccessful and the wells proved to be dry holes. Although the Suetter Placer Mines Trust Agreement provided that petitioner was to be entitled to a salary of $250 per month payable from the trust income, the mining operations were never successful or productive of income. *72 Petitioner, nevertheless, from time to time drew upon the trust funds in the trust bank accounts for his living expenses, not exceeding $50 a month. In the taxable years petitioner was not engaged in any business or occupation other than is set out above. Petitioner's failure to file a return for 1939 was not due to reasonable cause. No part of the deficiency for 1939 is due to fraud with intent to evade tax. Opinion ARUNDELL, Judge: For the year 1937 respondent determined that certain "unidentified" bank deposits totaling $34,133.40 constituted gross income to petitioner and, after allowing deduction for $20,007.24 as business expenses, he determined that petitioner realized net income of $14,126.16. We hold that respondent's determination was erroneous. In the year 1937 petitioner was acting as a trustee and operating under the Suetter Placer Mines Trust Agreement. The items making up the bank deposits in question have now been identified. They represented the proceeds of the sale of certificates of beneficial interest in the mining trust, were capital investments in that venture, and did not constitute income to the petitioner. Accordingly, there is no deficiency for 1937 *73 and consequently no fraud or delinquency penalty is in order. It is equally clear that respondent's determination of the deficiency for 1940 is erroneous. He determined that petitioner had a net income of $10,291.40, made up of two items: $291.40, stated to be funds received from unidentified sources and used to pay personal expenses; and $10,000 said to represent the value of equipment received from F. J. Beckman. As to the first item, we have found from the record that petitioner did not receive from unidentified sources the amount of $291.40, or any other amount, which he used for personal expenses. The second item has reference to certain mining equipment which Archbishop Beckman agreed, on August 29, 1940, to turn over to petitioner instead of the $10,000 due petitioner in 1940 under the terms of the compromise agreement of June 17, 1939. Actually petitioner did not receive any of this property or any money in lieu thereof. When petitioner attempted to obtain possession of the property at the Hercules Mines, he was refused. It appears that the property had been attached in a suit against the Hercules Mining Corporation and was later sold to a subsidiary of the Sun Oil Company. *74 There is nothing in the record to support respondent's suggestion that the property may have been appropriated by others to satisfy petitioner's obligations. So, we hold that there is no deficiency for 1940, and consequently no fraud or delinquency penalty is in order. As to the year 1939, the situation is somewhat complicated by the fact that Archbishop Beckman brought the injunction suit against petitioner in June, and the fact that the suit was settled on June 17, 1939, by an agreement, the principal provisions of which are set out in our findings. Counsel for petitioner contend that the agreement, by its terms, did not terminate the trust and that it could not effectively do so; that neither petitioner nor Beckman owned the properties because certificates of beneficial interest were held by others. The record is not entirely satisfactory in explanation of all the items which respondent determined resulted in income to petitioner in 1939. Our best judgment from the available facts, however, is that the unidentified bank deposits totaling $4,125.95 and the proceeds of sales of equipment in the amount of $33,500 did not result in income to petitioner. The bank deposits were made *75 in April 1939 in the bank account of the trust and were used in the general course of trust operations. Of that sum, $2,000 appears to have represented the sale of a light plant and lathe belonging to the trust, the light plant alone having an original cost of $3,219 exclusive of freight, in 1937. That item also is one of those included in the amount of $33,500 sales of equipment, the other two items being the sale of a dredge, or gold washing plant, for $22,500, and the sale of a dragline for $9,000. The dredge had cost in excess of $35,000. The sale was consummated on April 4, 1939, and the proceeds were deposited in the trust bank account on April 11, and used in trust operations. All this was prior to the compromise agreement in June. The cost of the dragline in 1937 was approximately $20,000. We are convinced that the equipment sold was trust property and the sales resulted in loss rather than gain to the trust. We therefore hold that petitioner realized no personal income from the so-called "unidentified bank deposits" or from the sales of equipment. We are likewise satisfied that petitioner did not receive $3,925 from unidentified sources in 1939, which he used to pay personal *76 expenses. Respondent has not explained how he determined that sum, but petitioner testified positively that he received no such sum. On cross-examination petitioner was not even asked about the item. There remains for consideration the item of $10,750, consisting of $10,000 in cash and $750 proceeds from the sale of a Packard automobile, received from Beckman. With respect to these the argument of counsel for petitioner is that the trust was not terminated by the compromise agreement and that, although that agreement purported to provide for a personal payment to petitioner, in equity the payment, as well as the proceeds from the sale of the automobile, inured to the benefit of the trust. It appears that Beckman and petitioner were the owners of almost the entire beneficial interests in the trust. So far as the evidence positively discloses, the only other holders of certificates were two priests, who had small interests. Their interests were recognized in the compromise agreement, and Beckman undertook to induce them to surrender their certificates in return for an interest in the corporation he planned to organize. It has not been demonstrated that the arrangements made in their *77 behalf were unsatisfactory or that they made any objection thereto. We cannot, therefore, say as a matter of law that the compromise agreement was wholly ineffective, and that the trust thereafter continued as before. In any event, petitioner admitted at the hearing that the payment which Beckman agreed to make was intended to compensate petitioner for the work he had done. We think that this sum of $10,000 which Beckman actually paid in 1939 constituted income to petitioner, and we so hold. However, of that amount $1,000 was retained by petitioner's attorney as his fee in connection with the transaction, and the $1,000 should be allowed as a deduction. In addition, petitioner has not satisfactorily demonstrated that the proceeds from the sale of the Packard did not constitute income.apparently the automobile was purchased with trust funds in 1937, but the sale took place in August 1939, after the compromise agreement, and no cost to petitioner has been shown. We accordingly hold that petitioner realized net income of $9,750 in 1939. Inasmuch as no return for 1939 was filed, the 25 per cent penalty for delinquency will be imposed. No reasonable cause for failure to file has been *78 shown. The fact that petitioner may have considered that the trust was not terminated and that the money received was trust money is not sufficient. The mere belief that no return was necessary does not constitute the reasonable cause required. See . The fraud penalty, however, is not warranted. The burden as to this issue was on the respondent, and the principal effort to sustain it consisted of cross-examination of the petitioner. It is true that respondent called one witness, an accountant who had been employed by petitioner in the early part of 1939 to make up statements of mining operations for submission to Beckman. The most his testimony establishes is that he advised petitioner that income tax returns should probably be filed because petitioner was handling large sums of money, though he doubted that any income tax would be due. Considered as a whole, his testimony rather corroborates petitioner's testimony that no income was produced from mining operations in any of the taxable years. The names of many persons with whom petitioner had had dealings were mentioned in the record, yet respondent did not call *79 any of them as witnesses. We have no doubt that petitioner was either not fully cognizant of, or else careless about, his duties and responsibilities as a trustee, and he was obviously lax about keeping proper records of operations. His actions in these respects were by no means commendable. Nevertheless, we conclude that respondent has not proved that there was any fraud on petitioner's part with intent to evade tax. Decision will be entered under Rule 50.